[No. C048881. Third Dist. Jan. 26, 2006.]

MAMMOTH MOUNTAIN SKI AREA et al., Plaintiffs and Appellants, v. DAVID GRAHAM et al., Defendants and Respondents.

## COUNSEL

Ronald L. Briggs and Steven G. Cohn for Plaintiffs and Appellants.

Molfetta & Associates and Ross W. Paulson for Defendants and Respondents.

## OPINION

**NICHOLSON, J.**—While snowboarding down a slope at Mammoth Mountain Ski Area (Mammoth), 17-year-old David Graham[1] was engaged in a snowball fight with his 14-year-old brother. As he was "preparing to throw a snowball" at his brother, David slammed into Liam Madigan, who was working as a ski school instructor for Mammoth. As a result of the collision, Madigan sustained injuries for which Mammoth had to provide workers' compensation benefits.

Madigan sued David and his parents, Geoffrey and Laura, for personal injury, alleging David was engaged in reckless and dangerous behavior and his parents encouraged his behavior. Mammoth sued David and Geoffrey for recovery of workers' compensation benefits it was obligated to pay Madigan.

David, Geoffrey, and Laura filed a motion for summary judgment alleging Madigan's and Mammoth's claims were barred under the doctrine of primary assumption of risk. The trial court granted the motion and entered judgment in favor of defendants. Plaintiffs appeal.

We reverse the judgment because there is a triable issue of fact whether David's conduct was so reckless as to be totally outside the range of ordinary activity involved in the sport of snowboarding.

### FACTS AND PROCEDURAL BACKGROUND

In reviewing the propriety of the grant of summary judgment, we view the facts in the light most favorable to the party opposing the motion, in this case, plaintiffs. (*County of Los Angeles v. Superior Court* (2002) 102 Cal.App.4th 627, 633, fn. 1 [125 Cal.Rptr.2d 637].)

On April 16, 2001, Madigan was working as a ski school instructor at Mammoth teaching a class of five teenaged students and one adult. Madigan had pulled over to the side of the slope and was standing still to watch his students.

---

[1] To avoid confusion, we will refer to the members of the Graham family by their first names.

The slope was "virtually empty" apart from the student group and the Graham family. Laura was skiing behind her sons who "were engaged in a snowball fight" while snowboarding down the slope "at a fast speed." David was "looking at the younger brother and preparing to throw a snowball when he slammed directly into Liam Madigan, who was standing still at the edge of the run."

Madigan appeared unconscious for a short time but was able to ski to the bottom of the slope. Madigan's adult student, Alastair Boyd, witnessed the collision from 20 meters away and "reprimanded" David. Laura approached and acknowledged David had been "fooling around" and not watching where he was going. When Boyd "suggested" Mammoth "pull [David's] ticket," Laura became "very volatile" and told David to leave the scene. David, however, "admitted that he was in the wrong and he did not leave."

As a result of the collision, Madigan was treated for neck, back, and shoulder pain. He still suffers from migraine headaches, neck and shoulder pain, and numbness in his upper back. He is unable "to work a full schedule" and "cannot do any physical activities without being in pain." As a result of his injuries, Madigan received workers' compensation benefits from Mammoth.

In depositions taken approximately two years after the collision, David testified he had been skiing since he was six or seven years old, had attended ski school every season until he was 15 or 16 years old, and was an "intermediate" snowboarder. He had never seen anyone "exchang[ing]" snowballs while "simultaneously going downhill," believed such activity would be outside the scope of normal "skiing activity," and "guess[ed]" it would be dangerous to be "skiing" downhill while engaged in a snowball fight with his brother.

Geoffrey similarly testified he believed it was dangerous to be engaged in a snowball fight while skiing downhill. He would not have approved of his sons engaging in such activity.

## STANDARD OF REVIEW

As we have observed, "[s]ummary judgment is properly granted if there is no question of fact and the moving party is entitled to judgment as a matter of law. [Citations.] We construe the moving party's papers strictly and the opposing party's papers liberally. [Citation.] The moving party must demonstrate that under no hypothesis is there a material factual issue requiring a trial, whereupon the burden of persuasion shifts to the opposing party to show, by responsive statement and admissible evidence, that triable issues of fact exist. [Citations.]

"However, 'from commencement to conclusion, the moving party bears the burden of persuasion that there is no genuine issue of material fact and that [it] is entitled to judgment as a matter of law. . . . There is a genuine issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' [Citation.] On appeal, we exercise our independent judgment to determine whether there are no triable issues of material fact and the moving party thus is entitled to judgment as a matter of law." (*Thousand Trails, Inc. v. California Reclamation Dist. No. 17* (2004) 124 Cal.App.4th 450, 457 [21 Cal.Rptr.3d 196]; see also *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843–857 [107 Cal.Rptr.2d 841, 24 P.3d 493].)

## DISCUSSION

### I

Under general principles of negligence law, people have a duty to use "ordinary care" to avoid injury to others and may be held liable for negligent conduct that causes injury. (Civ. Code, § 1714, subd. (a).) A limitation to this general rule is the doctrine of "primary assumption of risk" that recognizes "in certain situations the nature of the activity at issue is such that the defendant does not owe a legal duty to the plaintiff to act with due care." (*Bushnell v. Japanese-American Religious & Cultural Center* (1996) 43 Cal.App.4th 525, 529 [50 Cal.Rptr.2d 671].)

To determine whether the doctrine of primary assumption of risk applies to a sports participant, the court must decide whether the injury suffered arises from an " 'inherent risk' " in the sport, and whether imposing a duty might chill "vigorous participation" in the sporting event and thereby "alter fundamentally the nature of the sport." (*Knight v. Jewett* (1992) 3 Cal.4th 296, 316–319 [11 Cal.Rptr.2d 2, 834 P.2d 696] (*Knight*).)

In *Knight*, our Supreme Court noted, "in the heat of an active sporting event . . . a participant's normal energetic conduct often includes accidentally careless behavior." (*Knight, supra,* 3 Cal.4th at p. 318.) As a result, inadvertent collisions with coparticipants who carelessly or negligently cross paths are inherent risks of many sports. (*Mastro v. Petrick* (2001) 93 Cal.App.4th 83, 90 [112 Cal.Rptr.2d 185] [risk to skier of collision with a negligent or careless snowboarder]; *Moser v. Ratinoff* (2003) 105 Cal.App.4th 1211, 1222–1223 [130 Cal.Rptr.2d 198] [risk to participant in an organized bike race of collision

with a fellow racer who negligently moved to the side of the road]; *Distefano v. Forester* (2001) 85 Cal.App.4th 1249, 1263–1264 [102 Cal.Rptr.2d 813] [risk to an off-road motorcyclist of inadvertent collision with a dune buggy].)

■ On the other hand, the doctrine does not apply to a participant in an active sport who "intentionally injures another player or engages in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport." (*Knight, supra*, 3 Cal.4th at p. 320.) For example, the doctrine of primary assumption of risk did not bar liability of a discus thrower who threw a discus into a playing field before determining the target area was clear of another participant and warning her he was about to throw. (*Yancey v. Superior Court* (1994) 28 Cal.App.4th 558, 561, 566–567 [33 Cal.Rptr.2d 777].) In reversing summary judgment rendered in the trial court in favor of the defendant, the court found, unlike many sports such as football or baseball, discus throwing does not require a ball or other article be propelled towards the participants. (*Id.* at pp. 565–566.) "Nothing about the inherent nature of the sport requires that one participant who has completed a throw and is retrieving his or her discus should expect the next participant to throw without looking toward the landing area." (*Id.* at p. 566, fn. omitted.)

In this case, defendants contend David's behavior, "while arguably negligent," did not amount to recklessness because collisions "between snowboarders"[2] are "simply one of the risks inherent in the sporting activity of snowboarding." In support of their position, defendants cite *O'Donoghue v. Bear Mountain Ski Resort* (1994) 30 Cal.App.4th 188 [35 Cal.Rptr.2d 467] (*O'Donoghue*), a case in which the plaintiff suffered severe injuries after skiing through a gap between two groups of trees into a ravine and sued the ski resort for negligently maintaining and operating the resort. (*Id.* at p. 191.) In affirming summary judgment in favor of defendant based on the doctrine of primary assumption of risk, the court concluded the ski resort had no duty to protect the plaintiff from the natural hazards and obstacles that might be encountered by departing from the ski run. (*Id.* at pp. 193–194.) In reaching this conclusion, the court noted: "Skiing is an outdoor sport over mountainous terrain. Skiers can expect to encounter moguls on a ski run [citation], trees bordering a ski run [citation], snow-covered stumps [citation], and numerous other conditions or obstacles such as variations in terrain, changes in surface

---

[2] The collision in this case was not between snowboarders but, rather, between a snowboarder and a ski school instructor who was standing still at the side of the slope watching his students.

or subsurface snow conditions, bare spots, *other skiers*, snow-making equipment, and myriad other hazards which must be considered inherent in the sport of skiing. [Citation.]" (*Id.* at p. 193, italics added.)

The observation in *O'Donoghue* that "other skiers" are one of the hazards inherent in skiing does not compel the conclusion, as a matter of law, that the collision in this case was caused by conduct that was, at most, negligent. Rather, we must ask whether David's conduct was "so reckless as to be totally outside the range of the ordinary activity involved in the sport." (*Knight, supra,* 3 Cal.4th at p. 320.)

David was a 17-year-old intermediate snowboarder who had been skiing since he was six or seven years old and had taken lessons for approximately 10 years. David had never seen anyone throwing snowballs while "simultaneously going downhill," believed such behavior was outside the scope of normal "skiing" activities, and "guessed" it was dangerous to do so. His father similarly believed "skiing" downhill while engaged in a snowball fight was dangerous.

At the time of the collision, the slope was virtually empty and Madigan was standing still at the side of the slope to watch his students. Meanwhile, David and his brother were snowboarding down the same slope at a fast speed while engaged in a snowball fight. David was looking at his brother and preparing to throw a snowball when he slammed directly into Madigan.

This evidence could lead to a reasonable inference David acted recklessly, i.e., made a "conscious choice of a course of action . . . with knowledge of the serious danger to others involved in it . . . ." (Rest.2d Torts, § 500, com. (g).) Specifically, a jury could conclude the collision with Madigan was neither inadvertent nor unavoidable and occurred because David was not watching where he was going and was preoccupied with throwing a snowball at his brother instead of looking for those ahead of him in order to avoid a collision.

Finally, imposing liability for conduct such as David's will not deter vigorous participation in the sports of snowboarding and skiing or otherwise fundamentally alter the nature of either sport. While many cold-weather activities involve the throwing of snowballs, participation in snowboarding or skiing does not carry with it the inherent risk of being struck by another

snowboarder or skier engaged in a snowball fight. Imposing liability on those who cause collisions because they are throwing snowballs while snowboarding or skiing will encourage participants to engage in safe conduct.

■ We therefore conclude there is a triable issue of fact whether David's conduct was so reckless as to be totally outside the range of ordinary activity involved in the sport of snowboarding.[3]

## II

Recently, some appellate counsel appearing at oral argument in this court have found it convenient to misrepresent the state of the record. Whether it is to try to gain some advantage (on the assumption that the judges will take what they say at face value) or perhaps simply because they are reckless with the truth, it places an additional burden on the court. We are forced to reexamine the record to verify whether counsel's characterization is correct.

These cavalier mischaracterizations of the record must stop.

A serious mischaracterization of the record occurred in this case, at oral argument.

Counsel for the plaintiffs opened his oral argument with the following factually correct statement: "This is a case involving defendant David Graham who intentionally, willfully chose to stop paying attention to where he was snowboarding while he was proceeding with speed down a slope at Mammoth Mountain so that he could instead engage in a snowball fight with his brother . . . who was behind him and uphill."

When given the opportunity to respond, Ross Paulson, the attorney for the defendants, stated: "I believe that there's been a little bit of a mischaracterization here of, of, some of the factual background. I want to first clear that point up." Mr. Paulson continued: "There was evidence of one snowball having been thrown that was, that was, the evidence. And there was no evidence that he, David Graham, had ever thrown a snowball. That was what was submitted."

Mr. Paulson added: "There was no evidence that any snowball was ever thrown by David Graham." And later, he stated: "I think that what the

---

[3] Based on our resolution, we need not address plaintiffs' argument Madigan was not a participant in the sport of snowboarding or skiing at the time of the collision because he was acting in the scope of his employment as a ski school instructor for Mammoth.

evidence was that was submitted was that one snowball had been thrown by his brother and that David Graham was looking at his brother."

In his rebuttal, the attorney for the plaintiffs said: "I do want to clarify the state of the evidence and I am referring to the declaration of Alastair Boyd." He then read an excerpt from the declaration of Alastair Boyd, who was a teacher from England and who personally saw the events on the hill, including the accident. The declaration stated, in pertinent part: "On April 16, 2001, I was participating in a snow-boarding class with five teenage students from our school in England. The instructor from Mammoth Mountain Ski Area was Liam Madigan. [¶] . . . We were on the Forest Trail, on a fairly narrow run; the only people I recall being on this particular area of the slope at the time of this incident was our class and a family of four persons consisting of a mother, father and two boys. [¶] . . . Liam Madigan was skiing down ahead of his class; he had pulled over to the side of the run and was watching the other students snow-boarding down towards him. [¶] *The two boys in the family who were also on the hill were engaged in a snowball fight while snow-boarding at a fast speed; they were throwing snowballs at each other* and the older brother was looking at the younger brother and preparing to throw a snowball when he slammed directly into Liam Madigan, who was standing still at the edge of the run." (Italics added.)

Other portions of the record make clear that the "two boys" described in Mr. Boyd's declaration were, in fact, defendant David Graham and his brother.

When Mr. Paulson told the court that the record contained no evidence that David Graham had thrown a snowball, he misrepresented the record on a crucial point.

Business and Professions Code section 6068 provides in pertinent part as follows: "It is the duty of an attorney to do all of the following: [¶] . . . [¶] (d) To employ, for the purpose of maintaining the causes confided to him or her those means only as are consistent with truth, and *never to seek to mislead the judge* or any judicial officer *by an artifice or false statement of fact or law*." (Italics added.)

Because it is probable that attorney Ross Paulson has violated subdivision (d) of Business and Professions Code section 6068, as explained *ante*, we will request the clerk to forward a copy of this opinion to the State Bar of California.

## DISPOSITION

The judgment in favor of defendants is reversed. Plaintiffs shall recover their costs on appeal. (Cal. Rules of Court, rule 27(a)(1).) The clerk of this court is directed to forward a copy of this opinion to the State Bar of California.

Sims, Acting P. J., and Morrison, J., concurred.